UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| United States of America,<br><br>        Plaintiff,<br><br>vs.<br><br>Raymon Everett Holmberg, a/k/a Raymon Holmberg, a/k/a Ray Holmberg, a/k/a Sean Evan, a/k/a Sean Evans,<br><br>        Defendant. | Case No. 3:23-cr-00206<br><br><br>**DEFENDANT'S REPLY SENTENCING MEMORANDUM** |

## INTRODUCTION

The Presentence Investigation Report prepared by the United States Probation and Pretrial Services identifies that "Mr. Holmberg has several physical health ailments[,]" providing a summary his multiple diagnosed health conditions and issues,[1] as well as the medications and therapies needed to treat them.[2] In the words of United States Probation and Pretrial Services, Mr. Holberg "is 81 years old and has multiple physical health issues."[3] As identified by United States Probation and Pretrial Services, age can "be a reason to depart downward in a case in which the defendant is elderly and infirm[.]"[4] Additionally, "extraordinary physical impairment may be a reason to depart downward."[5]

---

[1]   ECF No. ECF No. 52 ("Presentence Investigation Report"), ¶ 70.

[2]   *Id.* at ¶ 71.

[3]   *Id.* at ¶ 95.

[4]   *Id.*

[5]   *Id.*

The Government's Sentencing Memorandum does not dispute that a defendant's ill health and advance age can warrant a downward departure under the United States Sentencing Guidelines (the "Guidelines"). Nor does the Government deny that Mr. Holmberg's physical condition and age are extraordinary. Nothing in the Government's Sentencing Memorandum disputes that a downward departure would be appropriate in this case, as identified by United States Probation and Pretrial Services in its Presentence Investigation Report, and as requested by Mr. Holmberg in his Sentencing Memorandum Supplement.

Nevertheless, the Government asks that this Court impose a guidelines sentence based on the limited analysis of the factors identified in Section 3553(a). This argument improperly ignores that this Court must separately determine whether a downward departure is warranted under the Guidelines. Additionally, the Government's argument fails to acknowledge the factors in Section 3553(a) that support a downward variance from calculated guideline range. Accordingly, Mr. Holmberg respectfully requests the imposition of a time-served sentence, with a period of home detention as a condition of his supervised release.

## LAW AND ARGUMENT

The Parties agree that this Court's sentencing determination is a three-step process, with the Court first determining the applicable range under the Guidelines, then determining whether there is cause to depart under the Guidelines, and concluding by determining whether any variance is warranted under Section 3553(a).[6] The Parties also agree that Mr. Holmberg's guideline range under step one is 37-46 months.[7] Accordingly, this Memorandum focuses on

---

[6]  *Compare* ECF No. 59, at 2, *with* ECF No. 60, at 2.

[7]  *Compare* ECF No. 59, at 2-3, *with* ECF No. 60, at 1.

the Parties' disagreements—whether there is cause to depart under the Guidelines in step two, and whether any variance is warranted under Section 3553(a) in step three.

**I.      Mr. Holmberg's age and physical condition warrant a downward departure from the calculated guideline range.**

As cited by the Presentence Investigation Report, the Guidelines identify "age"[8] and "extraordinary physical impairment"[9] as potential bases for a downward departure from a guideline sentence. "Age" and "physical condition" can provide a basis for a downward departure when—alone or in conjunction with other offender characteristics—they are different than a "typical" case.[10] In the words of the Guidelines, atypical age provides a basis for a downward departure "in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration."[11] Relatedly, the Guidelines recognize that atypical physical condition provides a basis for a downward departure "in the case of a seriously infirm defendant," because "home detention may be as efficient as, and less costly than, imprisonment."[12]

It is beyond reasonable dispute that Mr. Holmberg's age and physical condition are atypical. The Government does not deny that Mr. Holmberg is significantly older than a

---

[8]   U.S.S.G. § 5K2.22(1).

[9]   U.S.S.G. § 5K2.22(2).

[10]  U.S.S.G. § 5H1.1; U.S.S.G. § 5H1.4.

[11]  U.S.S.G. § 5H1.1.

[12]  U.S.S.G. § 5H1.4.

3

typical defendant, or that he suffers from numerous, serious, diagnosed conditions.[13] Indeed, as succinctly summarized by United States Probation and Pretrial Services, Mr. Holmberg "is 81 years old and has multiple physical health issues."[14]

Instead of analyzing these factors, the Government argues that the factors identified in Section 3553(a) warrant a within-guideline sentence.[15] But arguments regarding the weight of Section 3553(a) factors are irrelevant to step two—step two only concerns itself with whether there exist bases for departure under the Guidelines.[16] As outlined above, previously, and in United States Probation and Pretrial Services' Presentence Investigation Report, there are such bases for a departure in this case. Based on the voluminous medical records provided to the Court, even assuming that the Bureau of Prisons could provide adequate care for Mr. Holmberg, the fact remains that such care could be provided to Mr. Holmberg in a manner that would be less costly to the public through home detention, while still efficiently punishing Mr. Holmberg for his crime. The issue is not whether the BOP can care for Mr. Holmberg, but whether it should in this case. Mr. Holmberg respectfully requests the downward departure identified by the Guidelines.

---

[13] *See generally* ECF No. 60. Indeed, the Government itself explicitly acknowledged Mr. Holmberg's ongoing health issues and treatment on the record during the change of plea hearing.

[14] PSIR, at ¶ 95.

[15] *See* ECF No. 60, at 3-27.

[16] *Cf. United States v. Coyle*, 506 F.3d 680, 683 (8th Cir. 2007) ("[A] post-Booker sentence normally should be determined in a sequential manner, with the district court first determining the applicable guideline range, then deciding whether any traditional guideline departures are warranted, and finally considering the possibility of varying from the guideline sentence based on the factors in § 3553(a)." (citation omitted)).

**II.   The factors delineated in Section 3553(a) warrant a downward variance in sentence.**

After determining the guideline range, and determining whether there is cause to depart under the Guidelines, the final step in this Court's sentencing determination is whether the factors outlined in Section 3553(a) provide reasons for a downward variance.[17] While Mr. Holmberg addressed all relevant factors in his Sentencing Memorandum Supplement,[18] the Government's Sentencing Memorandum analyzed only two factors.[19] The totality of the factors identified in Section 3553(a) support Mr. Holmberg's requested sentence.

> A.   <u>The nature and circumstances of the offense and the history and characteristics of the defendant.</u>
>
> > 1.   *Offense background and circumstances.*

The Government characterizes Mr. Holmberg's offense conduct as repeated—

> trips to Prague where he frequented a brothel that catered to homosexual men who were looking to engage in commercial sex with adolescent-age boys; expressly requested others to obtain boys for purposes of engaging in commercial sex; and frequented a park adjacent to Wenceslas Square, a location where he purchased the services of adolescent-age boys for the purpose of sexual activity.[20]

While, the Government's summation of Mr. Holmberg's offense is salacious at first blush, careful review of the actual evidence—evidence obtained by the Government in its multi-year investigation of Mr. Holmberg—paints a different picture.

---

[17]   *Coyle*, 506 F.3d at 683.

[18]   *See* ECF No. 59, at Sec. III.

[19]   *See* ECF No. 60, at 3-27.

[20]   ECF No. 60, at 3.

First, the Government's use of the term "adolescent" is noteworthy. The term carries with it a connotation of an individual being underage. But the term is not synonymous with being underage. Instead, legal adults are also "adolescents" under the ordinary meaning of the term.[21]

And that is the case here. In its Sentencing Memorandum, the Government says that Mr. Holmberg had "commercial sex" with "adolescents."[22] But the Government's Sentencing Memorandum confirms that the "adolescent" at issue was a twenty-year-old adult.[23] The discovery disclosed by the Government also shows that no "commercial sex" occurred because payment was neither given nor received.[24] Instead, the adult engaging in consensual sexual contact with Mr. Holmberg reported to police that he declined any type of payment because he had a mutually enjoyable experience. The Government's summation that Mr. Holmberg repeatedly solicited "adolescents" for "commercial sex" is misleading.

And the Government's own investigation also confirms that any "commercial sex" with an "adolescent" in Prague was also likely with an adult. Using information gleaned from Mr. Holmberg's data, the United States Homeland Security Investigations specifically investigated

---

[21] *See, i.e.*, World Health Organization, *Adolescent Health*, *available at* https://www.who.int/health-topics/adolescent-health#tab=tab_1 ("adolescence is a phase of life between childhood and adulthood, from ages 10 to 19.").

[22] *See* ECF No. 60, at 11 ("HIS interviewed several . . . adolescent-age employees, some of whom engaged in commercial sex with [Mr.] Holmberg. One such employee, BLT, reported that [Mr.] Holmberg paid him for massages.").

[23] *See id.* at 27 (identifying BLT as a "[t]wenty-year-old").

[24] *Cf.* 18 U.S.C. § 1591(e)(3) ("The term 'commercial sex act' means any sex act, on account of which anything of value is given to or received by any person.").

a provider in Prague associated with Mr. Holmberg, and attempted to solicit commercial sex with a minor. The provider repeatedly rejected the overtures, outlining that no one underage worked there, and that commercial sex with a minor would be illegal. Indeed, even the other individuals who travelled to Prague with Mr. Holmberg, and cooperated with the Government in its investigation, could not confirm any instance of Mr. Holmberg having commercial sex with an individual under the age of eighteen,[25] and no such individual has been identified.[26] Simply stated, the Government's deliberate use of the term "adolescents" in a publicly-filed document was simply an effort to mislead the press so as to engender public scorn against Mr. Holmberg on the eve of sentencing—an effort that apparently worked.[27]

To be used in sentencing, this Court must find an allegation has been proven by at least a preponderance of the evidence.[28] While Mr. Holmberg continues to stand by his admission

---

[25] *See* ECF No. 60, at 5-6, 7.

[26] *Id.* at 11 (confirming the Government could not confirm Mr. Holmberg's sexual contact with any identifiable minor in Prague).

[27] *See* April Baumgarten, *Ray Holmberg exploited staff and high school, university students for decades, court docs say*, InForum, Mar. 21, 2025, *available at* https://www.inforum.com/news/north-dakota/ray-holmberg-exploited-staff-and-high-school-university-students-for-decades-court-docs-say ("Former Sen. Ray Holmberg had a long history of targeting young men before he traveled abroad to sexually abuse children, recently released court documents said." (emphasis added)); Melissa Van Der Stad & Michael McGurran, *Graphic emails from Ray Holmberg outline sex crimes, years of preying on children*, InForum, Mar. 19, 2025, *available at* https://www.inforum.com/news/north-dakota/graphic-emails-from-ray-holmberg-outline-sex-crimes-years-of-preying-on-children ("New court documents allege that former North Dakota State Sen. Ray Holmberg targeted the 'most vulnerable' while committing his sex crimes against children." (emphasis added)); *id.* ("According to federal court papers filed late Wednesday, March 19, officials detail that, for years, Holmberg targeted children in foreign countries[.]" (emphasis added)); *id.* (Beyond paying for sex with children abroad . . . ." (emphasis added)).

[28] *See, e.g.*, *United States v. Wade*, 435 F.3d 829, 831-32 (8th Cir. 2006).

7

during his change of plea that he violated Section 2423(b) when he traveled to Prague, the evidence does not show that the Government's sensational summary of its allegations ever occurred. The fact that Mr. Holmberg traveled overseas with intent to engage in commercial sex with a minor does not mean that he did have commercial sex with a minor. Inuendo is not evidence. Mr. Holmberg simply requests that this Court consider the actual evidence when sentencing him.

        2.     *Mr. Holmberg's history and characteristics.*

As for Mr. Holmberg himself, the Government summarizes Mr. Holmberg's life as nothing more than a prolonged exercise in the abuse of others.[29] Like the Government's characterization of the offense conduct, careful analysis again disproves this overbroad characterization.

First, the government focuses on allegations regarding "BH."[30] The Government identifies that BH committed suicide in 2021, nine years after having communicated with Mr. Holmberg online and via email. Without any supporting evidence, the Government argues that Mr. Holmberg "no doubt . . . contributed" to this suicide.[31] The media happily parroted this unsupported allegation.[32] But what the Government does not identify is that Mr. Holmberg

---

[29] ECF No. 60, at 12.

[30] *See id.* at 12-15.

[31] *Id.* at 15.

[32] Van Der Stad & McGurran, *Graphic emails from Ray Holmberg outline sex crimes, years of preying on children*, *supra* ("The child died by suicide years after the abuse, the report said."); Mike McFeely, *Holmberg the center of concentric circles of evil*, InForum, Mar. 20, 2025), *available at* https://www.inforum.com/opinion/columns/mcfeely-holmberg-the-center-

8

only had contact with BH through the internet, and that there is no evidence that BH ever believed Mr. Holmberg was anything other than what he portrayed to be online. In other words, there is no evidence that BH ever believed anything was amiss with Mr. Holmberg. Additionally, the Government fails to mention that BH was transsexual, a group with a significantly higher rate of suicide than the general population.[33] There is simply no evidence—let alone a preponderance of the evidence—that Mr. Holmberg in any way contributed to BH's tragic suicide.

Next, the Government argues that Mr. Holmberg "abused his power" because he would engage adult prostitutes while traveling in the United States.[34] While such behavior is criminal in every state except Nevada, the Government fails to draw a line for how the commission of misdemeanors a decade or more ago was an abuse of power. It was not.

The Government next alleges that Mr. Holmberg "exploit[ed] [y]oung [b]oys and [m]en in North Dakota."[35] The Government alleges that Mr. Holmberg, in 2013, "solicited sex from

---

of-concentric-circles-of-evil ("The boy later took his own life, which the prosecutor offers might've happened in part because of Holmberg's exploitation.").

[33] *See, e.g.*, Myeshia N. Price & Amy E. Green, *Association of Gender Identity Acceptance with Fewer Suicide Attempts Among Transgender and Nonbinary Youth*, Transgender Health (Feb. 8, 2023), *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC9991447/#:~:text=Transgender%20and%20nonbinary%20(TGNB)%20youth,the%20risk%20for%20these%20youth; *see also More than 40% of transgender adults in the US have attempted suicide*, Williams Institute at UCLA School of Law (July 20, 2023), *available at* https://williamsinstitute.law.ucla.edu/press/transpop-suicide-press-release/ ("A new study from the Williams Institute at UCLA School of Law finds that 81% of transgender adults in the U.S. have thought about suicide, 42% of transgender adults have attempted it, and 56% have engaged in non-suicidal self-injury over their lifetimes.").

[34] *See* ECF No. 60, at 15-19.

[35] *Id.* at 19-22.

RMJ, a 17-year-old boy who was attending Grand Forks Central High School."[36]  Notably, Mr. Holmberg retired from work at the school in 2002, more than a decade earlier.  Moreover, as identified by the Government's Sentencing Memorandum, Mr. Holmberg met RMJ "via a dating app[,]" an app for which RMJ falsified his age to identify himself as an adult.  There is also no evidence that Mr. Holmberg knew RMJ was only seventeen when they initially met, and even RMJ does not allege that any sexual contact occurred with Mr. Holmberg while he was underage.[37]  Consensual sexual contact between adults is not exploitation.

The Government also focuses on nearly 30-year-old allegations from 1997 concerning "SS."[38]  SS admits that nothing improper occurred with Mr. Holmberg while he was a student at Grand Forks High School.[39]  Nor did Mr. Holmberg seek to continue a connection with SS as the relationship only became sexual after SS had moved across the country, and only after SS chose to reach out to Mr. Holmberg to solicit money.[40]

The Government also identifies certain individuals who admitted to being in relationships of sorts with Mr. Holmberg.[41]  But the Government admits that these

---

[36]   *Id.*

[37]   *Id.* at 20-21.

[38]   *Id.* at 19-20.

[39]   *Id.*

[40]   *Id.*

[41]   *Id.* at 21-25.

relationships were not one-sided abuse, but instead involved conscious decisions by the people involved to associate with Mr. Holmberg for their own benefits.[42]

Again, none of this is to say that Mr. Holmberg is without fault, or that he has not made mistakes over his eighty-one-year life. Instead, Mr. Holmberg simply requests that this Court focus on the facts and circumstances of the offense for which he pleaded guilty, and consider the appropriate sentence for the same, rather than indulge the Government's attempt to engage in a character assassination for any mistake that Mr. Holmberg may have made over the last eight decades.

      B.    <u>The need for the sentence imposed.</u>

The second factor provided by Section 3553(a) for this Court to consider is:

the need for the sentence imposed—

> (1) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (2) to afford adequate deterrence to criminal conduct;
>
> (3) to protect the public from further crimes of the defendant; and
>
> (4) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.[43]

While the Government focuses on subfactors 1-3, the totality of the factors supports Mr. Holmberg's request for a sentence of home detention.

---

[42] *See, e.g.*, *id.* at 21 ("Even though he was not sexually interested in Mr. Holmberg, he maintained a relationship with him because he acknowledged that it would benefit his career.").

[43] 18 U.S.C. § 3553(a)(2).

> *1. Reflect seriousness of the offense, promotion of the respect for the law, and punishment.*

Under the first subfactor, the Government argues a thirty-seven-months sentence is needed to provide Mr. Holmberg his "just desserts."[44] More specifically, the Government argues additional incarceration is necessary because Mr. Holmberg "sexually exploited so many young males, some of who were as young as 13 years of age[,]" and that they "are almost certainly experiencing psychological, emotional[,] and physical injuries."[45] The Government provides no such evidence of such psychological, emotional, or physical injuries, however, because the Government admits it lacks substantive evidence of even a single minor assaulted by Mr. Holmberg.[46] Mr. Holmberg agrees that his sentence should reflect the seriousness of his offense. However, his sentence should not be increased on the basis of allegations for which the Government lacks substantive evidence, and for which Mr. Holmberg did not commit.

> *2. Deterrence and Protection of the public.*

The Government also argues a thirty-seven-month sentence is needed for deterrence and to protect the public from Mr. Holmberg.[47] As to deterrence, the Government argues a time served sentence "would represent a missed opportunity to deter criminal conduct that directly impacts the health and welfare of children located in other countries."[48] The problem

---

[44] ECF No. 60, at 25-26.

[45] *Id.* at 25.

[46] *Id.*

[47] ECF No. 60, at 26-27.

[48] *Id.* at 26.

for the Government's argument is that the increased severity of punishment does not provide increased deterrent effect—certainty of punishment, rather than duration of punishment, increases deterrent effects.[49] In other words, the time served sentence requested by Mr. Holmberg provides as much deterrent effect as the sentence requested by the Government.

---

[49] *See* Isaac Ehrlich, *Participation in Illegitimate Activities: A Theoretical and Empirical Investigation*, 81 J. Pol. Econ. 521, 544–47 (1973) (finding that the certainty of punishment was a more important indicator than severity in deterring murder, rape, and robbery); Harold G. Grasmick & George J. Bryjak, *The Deterrent Effect of Perceived Severity of Punishment*, 59 Soc. Forces 471, 472 (1980) (reviewing twelve deterrence studies and explaining that "nearly all these researchers conclude that perceived certainty of legal sanctions is a deterrent, [while] only one (Kraut) concludes that perceptions of the severity of punishment are part of the social control process"); Jeffrey Grogger, *Certainty v. Severity of Punishment*, 29 Econ. Inquiry 297, 304 (1991) (studying California arrestees and concluding that "increased certainty of punishment provides a much more effective deterrent than increased severity" and that a "six percentage point increase in average conviction rates would deter as many arrests as a 3.6 month increase in average prison sentences"); Steven Klepper & Daniel Nagin, *The Deterrent Effect of Perceived Certainty and Severity of Punishment Revisited*, 27 Criminology 721, 741 (1989) (surveying graduate students about tax evasion scenarios and finding that certainty of punishment is an effective deterrent); Daniel S. Nagin, *Criminal Deterrence Research at the Outset of the Twenty–First Century*, 23 Crime & Just. 1, 13 (1998) (reviewing the literature and concluding that "cross-sectional and scenario-based studies have consistently found that perceptions of the risk of detection and punishment have negative, deterrent-like associations with self-reported offending or intentions to offend"); Daniel S. Nagin & Greg Pogarsky, *An Experimental Investigation of Deterrence: Cheating, Self–Serving Bias, and Impulsivity*, 41 Criminology 167 (2003) (testing whether students would cheat on a trivia quiz to earn a cash bonus and finding that cheating decreased when the certainty of detection was higher but not when the perceived severity of punishment increased); Ann Dryden Witte, *Estimating the Economic Model of Crime with Individual Data*, 94 Q.J. Econ. 57, 79 (1980) (studying men released from the North Carolina prison system and demonstrating that "a percentage increase in the probability of being punished has a relatively larger effect on the number of arrests or convictions than does a percentage increase in the expected sentence"); Andrew von Hirsch et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* 47 (1999); Robert Apel & Daniel S. Nagin, *General Deterrence: A Review of Recent Evidence*, in *Handbook on Crime and Criminal Justice* (Michael Tonry ed.) (2011); Alfred Blumstein & Daniel Nagin, *The Deterrent Effect of Legal Sanctions on Draft Evasion*, 29 Stan. L.Rev. 241, 269 (1977) (studying draft evasion and finding a significant negative association between the probability of conviction and the draft evasion rate, leading the authors to conclude that their "findings are consistent with the work of other investigators who have argued that the certainty of punishment has a stronger deterrent effect on crime than the severity of punishment").

As to the protection of the public, the Government argues a thirty-seven-month sentence is necessary to protect the public because Mr. Holmberg paid an adult for sexual activities as recently as 2021.[50] Putting aside that solicitation of an adult prostitute is not relevant conduct with respect to the crime to which Mr. Holmberg pleaded guilty, and is instead a misdemeanor state crime, the Government's argument does not support its conclusion that Mr. Holmberg's conduct in 2021 evidences a greater risk to reoffend. Recidivism is an offender's risk to reoffend following a conviction. Mr. Holmberg, prior to this case, has never been convicted of a crime. Contrary to the Government's unsupported assertion that he is "near-certain" to reoffend,[51] the data compiled by the United States Sentencing Commission establishes that the risk of an offender of Mr. Holmberg's age to reoffend is "less than half that of offenders under the age of 50 (53.4%).[52] Moreover, as previously identified by Mr. Holmberg, recidivism rates are inversely proportional to age—the older an offender was at sentencing, the less likely to reoffend.[53] Individuals in Mr. Holmberg's cohort, age 70 and older, statistically reoffend at a rate of approximately 10%.[54]

Going beyond general statistics, the only offender-specific data regarding the risk of recidivism for Mr. Holmberg comes from Dr. Stacey Benson, a Licensed Clinical and Forensic

---

[50] *See* ECF No. 60, at 27.

[51] *Id.*

[52] *See* U.S. Sent'g Comm'n, *Older Offenders in the Federal System*, at 43 (July 2022), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220726_Older-Offenders.pdf.

[53] *Id.* at 55.

[54] *Id.*

14

Psychologist with Benson Psychological Services, PC.[55] As outlined therein, "[d]eviant sexual interest is one of the most well-established predictors of sexual recidivism[.]"[56] But Dr. Benson and the scientific community agree that Mr. Holmberg's conduct is not consistent with a "deviant sexual interest."[57] In other words, Mr. Holmberg does not pose an increased risk to reoffend, despite the Government's unsupported averment that re-offense would be "near-certain[.]"[58]

       3.     *Necessary training and treatment.*

The final subfactor in Section 3553(a)(2) that this Court must consider is the need for the sentence imposed to "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]"[59] The Government provides no analysis of this subfactor. And this subfactor strongly supports the sentence requested by Mr. Holmberg.

As to educational or vocational training, as previously outlined, Mr. Holmberg has already graduated from high school, obtained a bachelor's degree, as well as an advanced degree in counseling and guidance.[60] Mr. Holmberg—at 81—has also retired from the

---

[55] *See generally* ECF No. 59, Ex. 2.

[56] *Id.* at 1 (citation omitted).

[57] *Id.* at 1-2.

[58] ECF No. 60, at 27.

[59] 18 U.S.C. § 3553(a)(2)(D).

[60] PSIR, ¶ 76.

workforce. A sentence of incarceration is unnecessary to provide Mr. Holmberg with "educational or vocational training."

However, Mr. Holmberg's "medical care" could instead be "most effective[ly]" administered if this Court were to issue a sentence of time served, with an additional term of home confinement. "Mr. Holmberg's conditions and advanced age would be easier to manage in the community."[61] That is because, due to the health conditions and concerns previously outlined, Mr. Holmberg "will continue to require services from community-based specialists," and the BOP would "struggle[] to ensure [Mr. Holmberg would] receive timely services from experts outside the facility."[62] Such disruptions in treatment "could have a concerning and compromising impact on Mr. Holmberg's ongoing medical care needs."[63] But should the Court impose a term of home detention under a time-served sentence, Mr. Holmberg would be able to manage his own health conditions, with the public alleviated of the associated costs that his care requires, all while Mr. Holmberg remained under the watchful supervision of United States Probation.

    C.    <u>The kinds of sentences available.</u>

Another factor this Court must consider is "the kinds of sentences available[.]"[64] While the Government does not analyze this factor, this factor also supports a home detention sentence. The Guidelines specifically allow for a court to enter, as part of a supervised release

---

[61] ECF No. 59, Ex. 1, at ¶ 53.

[62] *Id.* at ¶ 46.

[63] *Id.*

[64] 18 U.S.C. § 3553(a)(3).

sentence, a term of "[h]ome detention. . . as a substitute for imprisonment."[65] Consistent with Guidelines, Mr. Holmberg respectfully requests the available sentence of imposition of a term of home detention, in lieu of further incarceration.

### D. Any pertinent policy statements.

Section 3553(a)(5) requires this Court to consider "any pertinent policy statement[.]"[66] While the Government does not analyze this factor, this factor also supports a home detention sentence. Again, Mr. Holmberg is "81 years old and has multiple physical health issues."[67] In such circumstances, the Guidelines identify that "punishment such as home confinement might be equally efficient as [and] less costly than incarceration."[68] Mr. Holmberg's request is consistent with the policy statements contained in the Guidelines.

### E. The need to avoid unwarranted sentencing disparities among defendants with similar records found guilty of similar conduct.

Finally, consistent with 18 U.S.C. § 3553(a)(6), the Court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]"[69] As previously outlined by Mr. Holmberg, refusing to

---

[65] U.S.S.G. § 5D1.3(e)(2).

[66] 18 U.S.C. § 3553(a)(5).

[67] PSIR, ¶ 95.

[68] *Id.*; *see also* U.S.S.G. § 5H1.1 ("Age may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration."); U.S.S.G. § 5H1.4 ("An extraordinary physical impairment may be a reason to depart downward; *e.g.*, in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment.").

[69] 18 U.S.C. § 3553(a)(6).

grant a downward departure or variance based on his age and physical health would, itself, produce an unwarranted sentencing disparity because "[t]he proportion of offenders receiving variances increase[s] as an offender's age range increase[s] . . . ."[70] Indeed, the oldest offenders studied—those over the age of 70—are nearly as likely to receive a variance (largely based on age, physical condition, and the need for medical treatment) as they are to receive a guideline sentence.[71]

And moving beyond the general populace, imposing a sentence of further confinement would only exacerbate a sentencing disparity. As outlined in the Government's Sentencing Memorandum, "CW1" traveled to Prague with Mr. Holmberg.[72] Prior to travelling to Prague, when shown images of the brothel that the Government contends catered to illegal underage sex trafficking, CW1 indicated that CW1 was "'in for a fun eastern Europe trip.'"[73] In other words, despite CW1 apparently possessing the same motivating factor as Mr. Holmberg to travel to Prague, the Government did not charge CW1 with a violation of Section 2423(b). Moreover, despite approximately thirty-five thousand pages of discovery disclosed in this case, it does not appear that the Government meaningfully investigated CW1 for such charges in that—unlike for Mr. Homberg—the Government limited its investigation of CW1's travel history and computer files. Similarly, the Government's Sentencing Memorandum identifies

---

[70] *See* U.S. Sent'g Comm'n, *Older Offenders in the Federal System*, 38 (July 2022), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220726_Older-Offenders.pdf.

[71] *Id.* at 38-39.

[72] *See* ECF No. 60, at 2.

[73] *Id.*

that "CW2" traveled to Prague at the same time as Mr. Holmberg, and actually engaged in sexual activities with Mr. Holmberg and a paid third-party.[74] Nevertheless, the Government never charged CW2 with a crime, and never meaningfully investigated him. As such, the very fact that the Government prosecuted Mr. Holmberg while ignoring others is a disparity, and a sentence of additional incarceration would only exacerbate the disparity the Government already created.

## CONCLUSION

For his crime, Mr. Holmberg has served nearly a full year of house arrest, and will have served 145 days in custody at the time of sentencing. Consistent with 18 U.S.C. § 3553, based on the PSIR and his submissions, and for the reasons that will be set forth at sentencing, Mr. Holmberg respectfully requests the Court impose a sentence of time served, together with a period of home detention as a condition of supervised release, the duration of such additional home detention determined by the Court.

Dated this 24th day of March, 2025

**VOGEL LAW FIRM**

BY: */s/ Mark A. Friese*
Mark A. Friese
Drew J. Hushka
218 NP Avenue
PO Box 1389
Fargo, ND 58107-1389
701.237.6983
Email:   mfriese@vogellaw.com
         dhushka@vogellaw.com
ATTORNEYS FOR DEFENDANT

---

[74] *See id.* at 6-7.